## ROSS v. ARMOUR FERTILIZER WORKS.*

### No. 16355.

Court of Appeal of Louisiana. Orleans.

June 1, 1936.

Porteous, Johnson & Humphrey, of New Orleans, for interveners-appellants.

J. I. McCain, of New Orleans, for plaintiff-appellant.

Denegre, Leovy & Chaffe, and N. P. Phillips, all of New Orleans, for appellee.

WESTERFIELD, Judge.

Mary Ross, the widow of Sam Ross, brought this suit against the Armour Fertilizer Works for compensation for the death of her husband, alleging that he was killed May 12, 1935, in the course of his employment by defendant at its plant in Shrewsbury, Jefferson parish, as a result of being struck by falling sacks of bone meal.

Sylvia Ross, wife of Joseph Lennox, and Arthemise Ross, wife of Charles Cook, sisters of the deceased, Sam Ross, intervened, and, though admitting Mary Ross to be the legal wife of Sam Ross, alleged that she was not living with or dependent upon him at the time of his death, and that, therefore, she was not entitled to compensation, which should be paid them in default of a compensable claim on the part of the widow.

Mary Ross filed an exception of no right or cause of action to this petition of intervention based upon the contention that both sisters were, at the time of decedent's death, over 18 years of age and were both married, and, therefore, not entitled to compensation under section 8, subsec. 2, par. C. of Act No. 20 of 1914, as amended by Act No. 242 of 1928, p. 360.

The defendant denied liability to either plaintiff or interveners, adopting as its defense the reasons urged by the wife as against the sister and by the sisters as against the wife.

There was judgment below in favor of defendant dismissing the claims of the wife and the sisters of deceased. Both plaintiff and interveners have appealed.

Since admittedly the interveners cannot obtain compensation if the wife has a valid claim, we shall first consider

the right of Mary Ross. The compensation law provides:

"(A) The following persons shall be conclusively presumed to be wholly and actually dependent upon the deceased employee. ,

"(B) A wife upon a husband with whom she is living at the time of his accident or death." Section 8, subsec. 2, pars. (A, B) of Act No. 242 of 1928.

"No compensation shall be payable under this Section to a widow unless she be living with her deceased husband at the time of the injury and death, or be then actually dependent upon him for support." Section 8, subsec. 2, par. (K) of Act No. 242 of 1928 (page 361).

It will be seen that the wife, who is living with her husband at the time of his death, is conclusively presumed to be dependent, whereas if she be living apart her claim for compensation must be established by proof of actual dependency.

Sam Ross was a negro laborer earning, at the time of his death, $10 per week as an employee of the defendant, possibly supplemented by his occupation as a professional gambler, for the record shows that for three or four nights during the week he acted as "banker" to a card game in a gambling house. In support of the claim of Mary Ross, the testimony of seven witnesses is found in the record. The evidence of these witnesses may be summarized as follows:

Mary and Sam were married in June, 1907, and lived together on Harlem avenue in Jefferson parish as man and wife for seven or eight years, during which time four children were born, all of whom died in infancy. Sam Ross enlisted or was drafted in the World War, returning to New Orleans in 1919. He resumed his relations with Mary in a house on Jeannette street maintained by her brother, with whom she was then living. The marital domicile was changed to Hickory street, and afterwards to Holly Grove in Jefferson parish, but Sam's residence with his wife after returning from the war was not continuous nor exclusive and his support of the household precarious. As a matter of fact, he was living with a woman by the name of Mary Jane Wright in a separate establishment near the place of his employment. However, he paid the rent and frequently spent the night with his wife, taking her out to drinking parties,

and otherwise maintaining the relation of husband and wife, intermittently, dividing his attention between Mary Jane Wright and Mary Ross.

Four witnesses testified on behalf of interveners, including Mary Jane Wright. These witnesses testified in effect that Sam had definitely separated from Mary Ross, whose name he never mentioned, and that he had been living exclusively with Mary Jane Wright for about ten years; that they had never seen him in company with his wife towards whom he appeared to entertain an antipathy; that his sole concern other than his interest in his relation with Mary Jane Wright was with his sisters, to whom he regularly contributed a part of his earnings.

In our opinion the testimony clearly preponderates in favor of the version of Sam's relation with his wife given by the plaintiff and her witnesses. These witnesses testified to affirmative facts bearing upon his relations; for example, a witness by the name of Ed. Anderson testified that Sam had paid him $3 a week for Mary's room and board during the year 1932, and $5 or $6 per month thereafter until March, 1935, and that since 1932 Sam spent one or two nights a month with Mary. John Adams testified that he had often visited Sam Ross at the Anderson house drinking and playing cards with Mary and Sam. The other witnesses who testified in Mary's behalf were quite as circumstantial in their testimony concerning Sam's relations with Mary.

In Fulton Bag & Cotton Mills v. Fernandez et al., 159 So. 339, 341, where we considered the claim of a legal wife as against a putative wife, we said concerning similar evidence on behalf of the putative wife: "In view of the fact that the legal wife concedes that most of his time was spent in New Orleans and that he only visited her overnight or for very short periods, such evidence as that to which we have just referred, even if true, is negative in character and must yield to the positive evidence given by witnesses who actually saw Fernandez on his many visits to his wife at her home in the parish of St. John the Baptist."

The long and short of the testimony is that Sam was living with two women at the same time, spending, perhaps, most of his time with his concubine, but he was, nevertheless, living with Mary Ross as her hus-

band at the time of his death. He was not an ideal husband. He could not or, at any rate, did not resist the allurement of an extra marital amour, but in this respect he was no worse than many individuals of more exalted station, if we are to believe song or story, history or romance. There is no evidence of his delinquency prior to his participation in the World War. Perhaps his martial experience contributed to his conjugal dereliction, for we have heard or read somewhere that the life of a soldier is not conducive to the maintenance of the best traditions of matrimony. But wherever Sam's errant affections may have taken him, he never entirely neglected Mary, for the record clearly shows that he was paying her rent, taking her to parties, drinking, eating, and sleeping with her during all the time he maintained the separate establishment with Mary Jane Wright. Not constantly, continuously, nor exclusively, but intermittently and irregularly, it is true; nevertheless, he was living with her within the meaning of the compensation statute. There was no separation by mutual consent. On the contrary, though familiar with Sam's transgressions, Mary always awaited his return to the conjugal domicile with eager anticipation and uncomplaining forgiveness.

In Milton v. Long-Bell Lumber Co., 165 La. 336, 115 So. 582, a separation by mutual consent which had existed for three or four months prior to the death of the workman was held to prevent recovery by the widow. But, as we pointed out in the Fernandez Case, supra, a separation by mutual consent is quite different from mere absence, however prolonged. It would be a very harsh ruling which would deprive a faithful wife of her status as a dependent widow nolens volens because of the protracted absence or infidelity of her husband. It would be an extreme case in which we would so hold. All of us at times are required to suffer vicariously, wives, perhaps, oftener than any other class, but the law favors the maintenance of the marriage relation. It views marriage in no other light than as a civil contract (Civ.Code, art. 86), a commutative, synallagmatic and not an aleatory contract, nevertheless, a contract intended to endure during the life of the contracting parties (Civ.Code, art. 89) and invested with solemnity (Civ.Code, arts. 99 et seq.). The presumption is that persons legally married are living together, a presumption juris, it is true, but it yields very reluctantly to proof of the contrary in view of the policy of the law favoring the permanence of the institution of marriage of which it is an important incident.

As Sam Ross' dependent widow Mary Ross is entitled to receive 32½ per cent. of $10, or $3.25 per week for 300 weeks. Plaintiff sues for funeral expenses which are admitted to have been paid. It is also admitted that defendant should be credited with the following amounts:

Flint-Goodrich Hospital ..........$172.50
Dr. Gordon Johnson ............   3.00
Dr. H. B. Alsobrook ............ 150.00
                                 ————
                                 $325.50

The conclusion which we have reached makes it unnecessary for us to consider the claims of interveners.

For the reasons assigned, the judgment appealed from, in so far as it dismisses the claim of interveners, is affirmed.

It is further ordered that the judgment dismissing plaintiff's claim be and it is reversed, and it is now ordered that there be judgment herein in favor of plaintiff, Mary Ross, and against the defendant, Armour Fertilizer Works, at the rate of $3.25 per week for 300 weeks, with interest on each installment from its due date, beginning May 12, 1935, subject to a credit of $325.50.

Affirmed in part; reversed in part.